IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARLENE DAGGETT,<br>a Pennsylvania Citizen,<br>500 South Waterloo Road,<br>Devon, Pennsylvania 19333,<br><br>                    Plaintiff,<br><br>                    v.<br><br>KELLEHER INTERNATIONAL, LLC,<br>a California Limited Liability Company,<br>145 Corte Madera Town Center #422,<br>Corte Madera, California 94925-1209,<br><br>                    Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

CIVIL ACTION NO.

## COMPLAINT

Plaintiff, DARLENE DAGGETT ("DAGGETT"), by her undersigned Counsel, brings this action for (1) Violation of California Civil Code §§1694, *et seq.* ("Dating Service Contracts"), (2) Breach of Contract, and (3) Unfair Competition (Business and Professions Code §§17200, *et seq.*) against Defendant, KELLEHER INTERNATIONAL, LLC ("KELLEHER").

In support hereof, Plaintiff avers as follows:

## THE PARTIES

1.      Plaintiff DAGGETT is an individual citizen of the Commonwealth of Pennsylvania who resides at 500 South Waterloo Road, Devon, Pennsylvania 19333.

2.      Defendant KELLEHER is a California limited liability company with a principal place of business at 145 Corte Madera Town Center #422, Corte Madera, California 94925-1209.

1

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to Title 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this district pursuant to Title 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

5.      The venue/jurisdiction provision in the dating service contract between DAGGETT and KELLEHER ("Contract") is permissive, not exclusive.

6.      This Court can apply California law.

## RELEVANT FACTS

## THE CONTRACT

7.      On or about May 1, 2014, DAGGETT signed a dating service Contract with KELLEHER, which purported to be the number one executive matchmaking service in the country.  A true and correct copy of the Contract is attached as Exhibit "A."

8.      DAGGETT paid $150,000 to KELLEHER for its matchmaking and dating services.

9.      In exchange, KELLEHER undertook to "introduce [DAGGETT] to members of the opposite sex, whom Kelleher has determined through in-depth interviews and limited screening to be potentially compatible with [DAGGETT]." *See* Exhibit "A."

10.     KELLEHER represents that it interviews, conducts in-person meetings with and screens potential compatible members of the opposite sex for the purpose of matching such individuals with its clients, including DAGGETT.

11.     KELLEHER represents that it interviews and conducts screening of applicants and purports to provide "suitable individuals for successful matches." *See* Exhibit "A."

12.     On its website, KELLEHER claims to be the "Gold Standard in upscale, selective, and personalized matching . . . with the largest private database of accomplished singles in the country . . .". *See* https://www.kelleher-international.com/.

13.     Pursuant to the Contract, KELLEHER represented and promised to introduce DAGGETT to members of the opposite sex whom Kelleher determined through in-depth interviews and screening to be potentially compatible with her, including: (1) facilitating the introduction process, (2) using its experience and judgment, and (3) using its resources, to identify suitable, qualified matches.

14.     The backgrounds, personalities, interests and behavior of DAGGETT's matches, however, reveal that KELLEHER did not use reasonable or good faith efforts to screen or identify a suitable match for DAGGETT.

15.     In fact, it is apparent that KELLEHER did not even do basic background research as part of its so-called "screening."

16.     The Contract Term was for 18 months, but given KELLEHER's initial slow start, extended gaps in introductions and several negative experiences, the Contract Term was extended multiple times.

## MEMBERSHIP LEVEL SELECTION

17.     DAGGETT chose KELLEHER due to its national reputation, and more importantly, its ability to select, pre-screen and provide introductions to compatible gentlemen from its allegedly vetted client roster.

18.    As a successful female executive, the pre-screening process was of paramount importance to DAGGETT.

19.    Due to her then senior level position in a local firm, DAGGETT felt that social dating sites did not provide her with the degree of screening and privacy she was looking for.

20.    Seeking these parameters, she chose KELLEHER's most "premium membership" available at the time and paid $150,000 to become part of its "CEO Club," which provides matches on a national and international basis.

21.    DAGGETT had a regularly scheduled weekly conference call with her matchmaker at KELLEHER to discuss potential upcoming matches and to underscore what DAGGETT was looking for in a potential match.

22.    Consistent in every conversation was DAGGETT's desire to be matched with a financially independent, retired or semi-retired gentleman who had significant flexibility in his schedule, a desire to travel frequently and was open to marriage.

23.    DAGGETT made it clear that she was willing to travel to meet matches, but that responsibility needed to be shared.

24.    During her three-year tenure with KELLEHER, DAGGETT was introduced to 25 different men, 23 of whom she had at least one date with. Only 5 matches resulted in more than two dates.

25.    The KELLEHER staff assured DAGGETT that they do extensive background checks on each client, adding that they meet with and interview each client they work with.

## DAGGETT'S "MATCHES"

26.     KELLEHER's "highly screened" matches for DAGGETT included men who were married, mentally unstable, physically ill, pathological liars, serial Lotharios, stalkers, convicted felons, unwilling or unable to travel and/or the subject of professional sanctions.

### #1 - The Interpol Spy

27.     DAGGETT was introduced to an Australian entrepreneur who was apparently well known to a senior staff member at KELLEHER.

28.     DAGGETT and the man hit it off quickly, had two dates in California, spoke for hours nightly and then took a trip to Panama and Costa Rica in the spring of 2015.

29.     DAGGETT flew home on a Sunday with the understanding that this gentleman was going to meet her in Pennsylvania the following weekend.

30.     Two days later he called and said, "He needed to go dark" for two weeks, but would stop on his way home to visit with DAGGETT.

31.     The man mentioned doing work for Interpol in previous conversations with DAGGETT, so DAGGETT thought this was a potentially legitimate, albeit strange occurrence.

32.     Eleven days later, DAGGETT received an email saying, "His life was not his own, and that he'd be gone until the end of the year." He went on to say that he would be totally off the grid with no cellular phone contact, text or email.

33.     On rare occasions, DAGGETT would receive messages saying he would call at a specific time, but these calls never took place.

34.     On another occasion, DAGGETT received a message from this same man stating that he had crossed three oceans, mountains, deserts and jungles, beaches, farmland and more time zones than he could count.

5

35.     According to DAGGETT, these brief communications had the feel of clandestine operations taking place in Eastern Europe.

36.     Thirteen months later, on or about June 20, 2016, DAGGETT received a telephone call from this gentleman's previous girlfriend with whom he had been cavorting around the globe.

37.     She informed DAGGETT that she had met with him after DAGGETT left their second date, and he had her fly in the same day that DAGGETT left Panama.

38.     When he went "dark," the two of them were actually sailing to Cuba. When he said he would be totally off the grid for the remainder of 2015, crossing oceans, deserts and the like, he was actually traveling all over Europe and Australia with this woman.

39.     During DAGGETT's conversation with this woman, she also mentioned to DAGGETT that this man was violent and had hit her twice.

### #2 - The Serial Lothario

40.     A few months later, in the fall of 2015, DAGGETT met a senior executive for a Fortune 500 company who lived in Belgium and worked in Poland.

41.     Despite the distance, he and DAGGETT spoke and texted multiple times a day.

42.     This gentleman flew to visit DAGGETT at Thanksgiving and again at Christmas.

43.     The relationship was off to a very positive start, and he and DAGGETT began planning their lives together. By all accounts, they were equally smitten and communicated this to KELLEHER.

44.     On the morning of December 27, 2015, DAGGETT received a tender morning message from this man, as was the custom between them, and by 2:00 p.m. that same

6

afternoon, this man had called off the relationship via email, saying he did not want to live in Pennsylvania part time.

45.    There was no fight, no telephone call, no compromise and no conversation.

46.    DAGGETT wanted the opportunity to understand how this relationship went so wrong so quickly and was deeply hurt by this man.

47.    DAGGETT pleaded with the staff at KELLEHER not to match this man again based upon her concern that he would do this again.

48.    The staff at KELLEHER re-matched this man shortly after his breakup with DAGGETT.

49.    Again, this man came on very strong, accelerating the relationship in a short period of time and did the exact same thing to the next woman.

50.    The fact that KELLEHER matched this man after KELLEHER was warned about his strange behavior indicates a lack of vetting related to potential matches and a lack of concern for the well-being of KELLEHER clients.

### #3 - The Alleged Widower Turned Convicted Felon and Stalker

51.    In February 2015, DAGGETT was matched with an alleged widower from Virginia.

52.    During lunch, he told DAGGETT he was having flashbacks. When DAGGETT inquired what that meant, he said, "It was a snowy and rainy day like today that my wife was killed."

53.    The man was tearing up and DAGGETT comforted him the best she could.

54.   For a multitude of reasons, DAGGETT was not interested in this man and did not continue to date him.

55.   A few months later, DAGGETT received an email from him, asking if DAGGETT would consider helping with some aesthetic decisions that needed to be made on an 11,000 square foot house that he was building in Boulder, Colorado.

56.   Given that he had lost his wife and DAGGETT has some talent in this area, she agreed to help him.

57.   DAGGETT made very clear that she was doing this out of kindness and continued to have no romantic interest in this man.

58.   The gentleman sent architectural plans, reclaimed wood samples and a kitchen cabinet door prior to meeting with DAGGETT.

59.   DAGGETT invited him to Philadelphia, Pennsylvania to review his plans and samples in person, as it would be difficult to do over the phone.

60.   DAGGETT and the man went out for dinner and DAGGETT noticed that she had a voicemail from an unknown number.

61.   Twice, DAGGETT listened to the first five seconds of the message before turning the phone over to this man, saying, "I think this call is for you. I'll give you a little privacy, and I'll be back in a few minutes."

62.   When DAGGETT returned, the man was ghostly pale.

63.   DAGGETT asked if everything was okay, and he said "no." When DAGGETT asked what was wrong, he said that he was married.

64.   The woman who left a voicemail on DAGGETT's phone was his wife, even though he previously informed DAGGETT that he was a widower.

65.     The man went on to tell DAGGETT that he had been raped as a child and his lying was latent behavior associated with the trauma.

66.     The man also said, "I need to cause pain and shame." DAGGETT did not ask for clarity about upon whom he wished to inflict such pain.

67.     Instead DAGGETT told him to get his bags and get out of her house immediately.

68.     All area hotels were fully booked so DAGGETT took him to the Philadelphia airport late that same evening.

69.     Earlier in the evening, his wife apparently called DAGGETT's ex-husband saying, "Did you know that your wife is having an affair with my husband?"

70.     DAGGETT's ex-husband said, "I'm not sure who you are, but I'm not married and I don't have a wife."

71.     DAGGETT called KELLEHER the following Monday to tell them about this man.

72.     According to KELLEHER, they immediately called him and removed him from KELLEHER's client roster.

73.     At DAGGETT's request, this man was told to never contact her again. The man agreed saying, "Out of respect for Darlene, I will not contact her by any means."

74.     This gentleman violated that promise by continuing to send emails to DAGGETT.

75.     Ultimately, an attorney letter was sent to him saying that if he continued to contact DAGGETT, she would seek a restraining order to stop these unwanted advances.

76.     About one year later, DAGGETT was traveling with her daughter in Europe when she received a telephone call from her realtor saying that a client from Virginia (the alleged widower) was interested in coming to see her home.

77.     While DAGGETT's home was on the market, it did not have a sign on the property, so this man must have been keeping track of her residence or movements in some fashion.

78.     DAGGETT told her realtor that under no circumstances was this man to be let into her home.

79.     DAGGETT believed that this man wanted to gain access to her home for one of three reasons. He wanted to see or speak with DAGGETT, leave something in her house or hurt DAGGETT or her children.

80.     DAGGETT was genuinely frightened for her personal safety and that of her family.

81.     DAGGETT hired a prominent attorney to write a very stern warning regarding this continued contact, making clear that she would file a restraining order and a criminal complaint for violation of the Pennsylvania Stalking Statute. Local police officials were also made aware of the incident and patrolled DAGGETT's property while she was out of the country.

82.     DAGGETT consulted a Private Detective to see if she needed security for herself and her family.

83.     Most challenging of all, DAGGETT had to sit down with her four children and tell them that she had a potential stalker who had tried to gain access to their home.

10

84.    As a result, doors needed to be locked at all times and DAGGETT asked her family to report any cars lingering in the driveway that did not belong on the property.

85.    DAGGETT unintentionally reported friends of her children to the police because she did not recognize their cars.

86.    This compromise to DAGGETT's privacy and safety has changed her way of life and her family's.

87.    Last year DAGGETT's best friend received a call from a woman at her place of business. The woman said she got DAGGETT's friend's telephone number from this man's cellular telephone and that she was investigating a number of improprieties.

88.    Her friend was told that the FBI was involved. The woman said, "He's been cooking the books and laundering money, running up $20,000 AMEX bills on designer dresses, women's shoes and high-end hotels."

89.    Apparently, this man was also paying "hush money" to Ashley Madison – an online dating service that targets married individuals seeking to have affairs -- and was also sending monthly checks to a woman in California because he was married.

90.    The woman on the phone said that the man also tried to kill himself.

91.    On December 9, 2016, this man was convicted of bank fraud in the amount of $10.5 million dollars.

92.    The government did not initially seek detention, but on February 10, 2017 his bond was revoked because he attempted to buy a King Air jet from a Texas aircraft consulting group. It was determined that this man was a flight risk and he was remanded to county jail where he currently awaits sentencing.

## #4 - The Censured Judge

93.     Approximately two months ago, DAGGETT received a call from the Founder of KELLEHER who said she had identified a man that she thought would be an interesting match.

94.     DAGGETT was told that he was a New York State Supreme Court Justice and top mediator in the country.

95.     The Founder of KELLEHER said she had spoken with this man, but her contact in New York was away and had not met him yet.

96.     Based on what DAGGETT was told, she was interested in meeting this man.

97.     The Founder of KELLEHER provided his name and DAGGETT immediately conducted a rudimentary internet search on this man to learn more about him.

98.     What DAGGETT found on that initial search was alarming to her.

99.     This gentleman was censured for carrying on an affair with an attorney who regularly appeared before him and for sneaking off to broadcasting school while he was supposed to be in court.

100.     DAGGETT called KELLEHER to share her concerns and the Founder of KELLEHER said, "It couldn't have been that bad.  He still has a job."

## #5 – First Seriously Ill Man

101.     DAGGETT, without her prior knowledge, was matched with a gentleman who had Crohn's disease for close to fifty years.

102.     After spending several months developing a relationship and traveling with this man, DAGGETT realized that she could not surrender her desire for an active and robust retirement to become a future caretaker for this man.

103.    Had DAGGETT been presented with the facts, she would not have chosen to be matched with this individual, saving both of them the heartbreak of breaking off a relationship.

104.    DAGGETT's concerns of future health problems turned out to be correct because this man was, sadly, diagnosed with Parkinson's disease at the end of last year.

### #6 – Second Seriously Ill Man

105.    The very next man that KELLEHER matched DAGGETT with, unbeknownst to DAGGETT, had a very serious heart condition and had suffered three prior strokes.

106.    During the first date between this man and DAGGETT, this gentleman lost consciousness in her car.

107.    DAGGETT immediately tried to take him to the nearest hospital.  When the man regained consciousness, he pleaded not to be taken to the hospital and instead asked that he be taken back to DAGGETT's home.

108.    The man shared with DAGGETT that he had blockages in both carotid arteries and wanted to go back to Pittsburgh, Pennsylvania to be treated by his own cardiologist.

109.    This man had surgery at the beginning of the year and is still in rehabilitation six months later.

### Miscellaneous Mismatches

110.    KELLEHER also matched DAGGETT with a series of gentlemen that did not meet her criteria for suitable matches, as DAGGETT reiterated during her weekly conference call with her matchmaker at KELLEHER.

111.    Despite expressing that she wanted to be matched with a financially independent, retired or semi-retired gentleman who had significant flexibility in his schedule, a

desire to travel frequently and was open to marriage, DAGGETT was matched with the following men:

a.      DAGGETT traveled to San Francisco, California and was matched with a man who had no interest in a bicoastal relationship and was unwilling to travel.

b.      DAGGETT was visited by and traveled to Boston, Massachusetts to meet a man who did not meet the criteria for financial independence, semi-retirement or flexibility to travel. This match was in his 60's and wanted to work until his late 70's or early 80's and lived in a small two bedroom condominium. This gentleman shared custody of his sons. His youngest son was still in elementary school and his custody arrangement prohibited him from moving out of Massachusetts until his nine-year-old son turned eighteen.

c.      DAGGETT traveled to Miami, Florida to meet a man who resided in New York, New York and Miami, Florida, but was only interested in dating women in their 40's. DAGGETT was matched with him despite the fact that KELLEHER was aware of his strong preference for younger women. This match also had a wife with a long-term critical illness and was not open to marriage until she passed.

d.      DAGGETT traveled to Nantucket, Massachusetts to meet a match that otherwise met her criteria, but DAGGETT was invited to a party on his boat where unlawful substances were being consumed on board.

e.      DAGGETT also traveled to Avalon, New Jersey to meet a match that had no interest in traveling.

14

## KELLEHER'S WOEFULLY INADEQUATE SCREENING

112.   Basic due diligence that KELLEHER claims to conduct, including personal interviews, screening and background research should have disclosed that DAGGETT's matches were men who were married, mentally unstable, physically ill, pathological liars, serial Lotharios, stalkers, convicted felons, unwilling or unable to travel and/or the subject of professional sanctions.

### COUNT I
### VIOLATION OF CALIFORNIA CIVIL CODE §§1694, *et seq.*
### ("DATING SERVICE CONTRACTS")

113.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

114.   The Contract is a dating service contract, as defined by Cal. Civ. Code § 1694.

115.   Upon information and belief, KELLEHER did <u>not</u> conduct due diligence, interviews, in-person meetings, background searches and/or screen DAGGETT's matches as represented and advertised.

116.   KELLEHER provided willful, fraudulent and/or misleading information to DAGGETT concerning its "in-depth" screening process for potential matches.

117.   KELLEHER's advertising regarding its due diligence, including personal interviews, screening and background research is similarly fraudulent and/or misleading to clients seeking high-level, safe and personalized matchmaking services.

118.   The Contract was entered into by DAGGETT under willful and fraudulent or misleading information or advertisements of KELLEHER and, is therefore, void and unenforceable *ab initio* under California law. *See* Cal. Civ. Code §1694.4(b) ("[a]ny contract for dating services entered into under willful and fraudulent or misleading information or advertisements of the seller is void and enforceable."); *Duffens v. Valenti*, 74 Cal. Rptr. 3d 311

(Cal. Ct. App. 4th Dist. 2008); *Porter v. Valenti Int'l Ltd.*, No. 050446, 2008 Cal. App. Unpub. LEXIS 2560 (Cal. Ct. App. 4th Dist. 2008).

119.   The Contract contains a provision requiring that "prior to instituting any litigation against the other party hereto, any dispute concerning this agreement or between parties thereto shall be submitted in good faith to mediation." *See* Exhibit "A," p. 3.

120.   The Contract is void and enforceable for the reasons stated above, so DAGGETT had no obligation to mediate before filing this action, but attempted to mediate in good faith regardless. DAGGETT offered to mediate in Chicago, Illinois, as a midway point between DAGGETT in Pennsylvania and KELLEHER in California. KELLEHER refused to mediate anywhere, but in California.

121.   As a direct and proximate result of the willful and fraudulent or misleading information or advertisements of KELLEHER, DAGGETT has suffered, at a minimum, actual monetary damages in the amount of $150,000.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor on the claims set forth above and award Plaintiff monetary damages, treble damages, attorneys' fees and costs, pursuant to Cal. Civ. Code §1694.4(c).

**COUNT II – IN THE ALTERNATIVE
BREACH OF CONTRACT**

122.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

123.   In the alternative, the Contract between KELLEHER and DAGGETT is a valid and enforceable agreement, which DAGGETT fully performed by paying KELLEHER $150,000 dollars.

124.   In exchange, KELLEHER undertook to "introduce [DAGGETT] to members of the opposite sex, whom Kelleher has determined through in-depth interviews and limited screening to be potentially compatible with [DAGGETT]." *See* Exhibit "A."

125.   Implied in every contract in California is a duty of good faith and fair dealing.

126.   KELLEHER had a duty to use reasonable and good faith efforts to conduct due diligence to screen and determine suitable potential matches for DAGGETT.

127.   DAGGETT reasonably relied upon KELLEHER'S experience, expertise and representations related to its matchmaking and dating services.

128.   KELLEHER breached its Contract with DAGGETT by failing to use reasonable or good faith efforts to conduct due diligence, interviews, in-person meetings, background searches and/or screening of DAGGETT's potential matches.

129.   KELLEHER also failed to use reasonable or good faith efforts to find a potentially compatible match for KELLEHER based on personalized profile-based searches, which constitutes a breach of the Contract.

130.   DAGGETT did not receive the benefit of the Contract that she bargained for (*i.e.*, KELLEHER's personalized screening and introductions to compatible matches), which disappointed DAGGETT's reasonable expectations and frustrated the purpose of the Contract.

131.   The Contract provides that "[i]n the event that any litigation arises in connection with this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and expenses." *See* Exhibit "A," p. 3.

132.   As a direct and proximate result of KELLEHER's breach, DAGGETT has suffered, at a minimum, actual monetary damages in the amount of $150,000.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor on the claims set forth above and award Plaintiff monetary damages, attorneys' fees and costs.

## COUNT III
## UNFAIR COMPETITION (BUSINESS AND PROFESSIONS CODE §§17200, *et seq.*)

133.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

134.    KELLEHER represents that it interviews, conducts in-person meetings with and screens potential compatible members of the opposite sex for the purpose of matching such individuals with its clients, including DAGGETT.

135.    On its website, KELLEHER claims to be the "Gold Standard in upscale, selective, and personalized matching . . . with the largest private database of accomplished singles in the country . . .". *See* https://www.kelleher-international.com/.

136.    KELLEHER has disseminated statements to consumers in advertisements, and to DAGGETT personally, concerning the nature and quality of KELLEHER's screening process related to its dating services, which KELLEHER knows or should know through the exercise of reasonable care, are untrue and/or misleading.

137.    Upon information and belief, KELLEHER does not conduct due diligence, interviews, in-person meetings, background searches and/or screen matches as represented and advertised, or misleads consumers into believing that KELLEHER's screening process for potential matches is "in-depth" and comprehensive, when it is not.

138.    KELLEHER's advertising regarding its due diligence, including personal interviews, screening and background research is fraudulent and/or misleading to clients seeking high-level, safe and personalized matchmaking services.

139.    Such representations and advertisements are likely to deceive members of the public, including DAGGETT.

140.    Business conduct that is unfair, fraudulent or unlawful is a violation of California's Unfair Competition Law (Business and Professions Code §§17200 *et seq.*).

141.    It was unfair, deceptive, fraudulent and/or misleading for KELLEHER to represent itself as a premier matchmaking service with an elite, vetted clientele and highly-customized profile matching.

142.    As a direct and proximate result of KELLEHER's conduct, DAGGETT suffered injury, including monetary loss.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor on the claims set forth above and require Defendant to make restitution to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in her favor and against KELLEHER as follows:

a.    That the Court award restitution and monetary damages, according to proof;

b.    That the Court award treble damages;

c.    That the Court award attorneys' fees and costs;

d.    That the Court award pre-judgment and post-judgment interest; and

e.    That the Court award such other and further relief as the Court deems just and proper.

Respectfully Submitted,

PEPPER HAMILTON LLP

M. Kelly Tillery, Esquire
Attorney I.D. No. 30380
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
Telephone:  (215) 981-4000
Facsimile:  (215) 981-4750
Email: tilleryk@pepperlaw.com

Dated:  August 2, 2017                    *Attorney for Plaintiff, Darlene Daggett*

# EXHIBIT A



*making love happen... since 1986*

## MASTER CONTRACT

Date: 4/28/2014                                          Rep: **Kym Galloway**

| Name (Hereinafter "Client"): **Darlene Daggett** | | | | | | |
|---|---|---|---|---|---|---|
| Primary Address: **500 South Waterloo Road** | | | Billing Address (If Different): | | | |
| City: **Devon** | State: **PA** | Zip: **19333** | City: | | State: | Zip: |
| Phone: **484-467-6129** | | | Date of Birth: **06/04/55** | | | |
| Fax: | | | Driver's License #: **22-710-741** | | | |

## Membership Specifications

| Membership Type: ☐ <br> Multi-Office ☐ / National ☐ / International ☐ / Elite ☐ <br> See Terms & Conditions for any additional geographic limits) | Contract Start Date (Hereinafter "Effective Date"): |
|---|---|
| Retainer Fee (Hereinafter "Retainer Fee"): | **$150,000** |
| Active Term: <br> ## 18 months | If at any time while this Agreement is in force the Client wishes to be placed on inactive status, Client may do so for the specified additional, cumulative 12 month period, by written notice. to Kelleher International. |
| SPECIAL INSTRUCTIONS: | |

## Payment Information – Electronic Check

| Name on Account: <br> ## Darlene Daggett | Payment Amount: <br> ## $150,000 |
|---|---|
| Bank ACH Routing Number: | Checking Account Number: |

**Client acknowledges having read and understood this Master Contract with the attached three-page Kelleher International Terms and Conditions. Your signature on this Agreement guarantees your comprehension and acceptance of all its terms, covenants and conditions. An executed copy transmitted by email or facsimile shall have the same effect as the original. Client may cancel this agreement, without penalty or obligation, at any time prior to midnight of the third business day following the date of Client signature (the "Effective Date") excluding Sundays, and holidays. To cancel this agreement, mail or deliver a signed and dated notice, or send a telegram which states that you are canceling this agreement or words of similar effect.  Said notice shall be sent to Kelleher International, LLC., 145 Corte Madera Town Ctr #422 Corte Madera, CA  94925-1209**

Client Signature: *Darlene Daggett*                      Date: 05/01/2014
Darlene Daggett (May 1, 2014)

Kelleher Signature: _____            Date:

## KELLEHER INTERNATIONAL LLC MASTER
## CONTRACT TERMS & CONDITIONS

Together with the Master Contract, this agreement (the "Agreement") is entered into as of the Effective Date, by and between Client and Kelleher International, LLC (hereinafter "Kelleher") who each agree to the following terms and conditions. Kelleher's intent is to introduce Client to members of the opposite sex, whom Kelleher has determined through in-depth interviews and limited screening to be potentially compatible with Client. This process is referred to as facilitating an Introduction.

Because of the complexities and uncertainties involved with any personal relationship, Kelleher cannot guarantee that Client will find a partner for marriage, companionship or other relationship who will satisfy all of Client's subjective criteria. Kelleher will use its experience and judgment to work with Client to provide Introductions to individuals who also desire to form a long-term or compatible relationship. Client understands that the resources created by Kelleher include qualified persons who have both paid and not paid a fee.

Kelleher reserves the right to terminate this Agreement in the event that Kelleher determines in its sole discretion that: (a) Client is attempting to exploit, abuse, or use Kelleher's services or information for any immoral, illegal or harassment purposes or activities; or (b) Client displays inappropriate behavior, is disrespectful, discrediting or depreciative in any manner to other members or Kelleher representatives; or (c) there are any material inaccuracies in any information provided by Client. In the event that Kelleher terminates this Agreement pursuant to this paragraph, any fees paid by Client shall not be refunded.

In the event that Client desires any personal information to remain confidential, Client shall specifically set forth in writing the information to remain confidential and Kelleher will, to the best of its ability, maintain in confidence such information. Client agrees that all other information provided by Client to Kelleher and on the Introduction Profile may be shared with other clients and members. Client agrees that Kelleher will not be liable for the release of any confidential information concerning Client, nor liable to Client for any loss or damage whatsoever which may result from said release.

Kelleher does not guarantee or warrant the accuracy of the personal information provided to Kelleher by any client or other member, and Client agrees that Kelleher shall not be responsible or liable for any false or misleading information provided by Kelleher to anyone including Client.

Kelleher interviews and conducts limited screening of applicants for membership; however, Kelleher neither conducts nor requires its clients or members to submit to any medical, legal or psychological testing or evaluation. Client agrees that Kelleher will have no legal liability for any injury or damage to Client resulting from assault, sexually transmitted diseases, or any other injury or damage alleged by Client arising from any introduction by Kelleher. Client shall indemnify and hold harmless Kelleher and all Kelleher International independent matchmaking offices, companies or other affiliates, and their respective officers, directors and employees (collectively, the "Indemnities") for any action, claim, damage, costs and expenses of any kind (including without limitation reasonable attorneys' fees) arising out of Client's dealings with Kelleher.

Retainer fee: Client agrees to pay the Retainer Fee specified in the Master Contract. Client agrees and understands that the Retainer Fee is distributed directly toward the matchmaking process of, but not limited to, facilitating introductions, time spent working directly or indirectly on Client's files and/or behalf, general advertising, networking, scouting and marketing necessary to attract suitable individuals for successful matches, research checking, personal consulting/coaching, various relationship management and dating counseling services, dating etiquette and other self-improvement consulting, and for time and effort to maintain the Client's file over the term of agreement.

Client's Name: __Darlene Daggett__     Client's initials: _____

Kelleher International, LLC.          Master Contract          Page 2 of 4          Rev15 7/25 SAS

Client agrees to matches with certain persons who are potentially compatible. This fee is payable in full at the time of execution of this Agreement and all fees paid to Kelleher are non-refundable.
Please initial *DHD*

Client may not assign or otherwise transfer this Agreement or any rights or obligations under it.

For New York residents and New York Clients only, the Parties agree that $1,000 of the fee paid is applicable to New York referrals and Client also agrees to travel within the Tri-State area for social referrals. Any member may place their membership on hold for a period of up to one year and agrees to a minimum of six referrals per year.

Kelleher Feedback Form: Client agrees to complete and return Kelleher's Feedback Form after each introduction. Client agrees and understands that the receipt by Kelleher of the Feedback Form is critical to this Agreement and receipt of the Feedback Form is required before Kelleher will make any additional introductions.
Please Initial *DHD*

Non-Disparagement: Client agrees to not disparage or make negative or derogatory remarks about Kelleher or any of its principals, agents, members, clients, and employees publicly at any time during or for five (5) years subsequent to contract period without first contacting Kelleher to engage in a good faith effort to resolve Client's concerns. The parties expressly understand that public disparagement includes, but is not limited to, posts to blogs, consumer review websites and social media.  Please Initial *DHD*

Death, Disability and Relocation: If by reason of death or disability Client is unable to receive all services for which Client has contracted, Client and the Client's estate may elect to be relieved of the obligation to make payments for services other than those received before death or the onset of disability.

If the Client has prepaid any amount of services, so much of the amount prepaid that is allocable to services that the Client has not received shall be promptly refunded to the Client or his or her representative.

"Disability" means a condition which precludes Client from physically using the services specified in the contract during the term of disability and the condition is verified in writing by a physician designated and remunerated by Client. The written certification of the physician shall be presented to Kelleher.

If the physician determines that the duration of the disability will be less than six months, Kelleher may extend the term of the contract for a period of six months at no additional charge to Client in lieu of cancellations.

In the event of relocation and pursuant to California legislation, Client agrees that Kelleher provides its services nationally and internationally. In the event of Client's relocation, the Parties will work in good faith to maintain this Agreement. If Client relocates his or her primary residence further than 50 miles from the geographic area defined in this Agreement and Kelleher is unable to transfer the contract and provide comparable services, then Client may elect to be relieved of the obligation to make payment for service other than those received prior to that relocation, and if Client has prepaid any amount for dating services, so much of the amount prepaid that is allocable to services that the Client has not received shall be promptly refunded to Client.  Any Client who elects to be relieved of further obligation pursuant to this subdivision may be charged a predetermined fee of one hundred dollars ($100), or, if more than half of the life of the contract has expired, a predetermined fee of ($50).

Additional Provisions: In the event that any litigation arises in connection with this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and expenses. This agreement was accepted and entered into in the State of California. The parties agree to Marin County, California state court, jurisdiction, venue, and choice of law. The parties hereto agree that prior to instituting any litigation against the other party hereto, any dispute concerning this agreement or between parties thereto shall be submitted in good faith to mediation.

Client's Name: **Darlene Daggett**                   Client's initials *DHD*

Each provision of this Agreement shall be deemed severable and if for any reason, any provision hereof is invalid or contrary to any existing or future law, such invalidity shall not affect the applicability or validity of any other provision of this Agreement.

Previous Misconduct: By executing this Agreement, Client represents that he or she has never been charged with a felony or a sexually related assault. Client also represents that he or she has never been charged with domestic violence nor has a restraining order (Order of Protection) ever been requested or issued against him or her. Please initial: DHD

Client Authorization: The Client hereby authorizes Kelleher International, LLC and/or its agents to investigate and secure any reports on the Client or obtain any information that is deemed by Kelleher to be relevant. Please initial: DHD

Non-Refundable Contract: The Client has read and understands that the retainer fees paid are completely non-refundable and are distributed as described in this Agreement. Please initial: DHD

Once executed, please Fax                    or email
or mail to: Kelleher International, LLC, 145 Corte Madera Town Ctr #422 Corte Madera, CA  94925-1209. Once received, this Agreement will be executed by Kelleher International, LLC. and a fully executed copy will be provided on request.

Bank Wire Instructions

Kelleher International
145 Corte Madera Town Ctr #422 Corte Madera, CA  94925-1209
+1 (415) 332-4111

Domestic Transfers
Routing #:  026009593
Account #:  000106240003
Bank Information:  Bank of America, 89 Broadway Blvd., Fairfax, CA 94930 USA
(415) 453-5830

International Transfers
SWIFT code/International Bank Account Number (IBAN): BOFAUS3N
Account #:  000106240003
Bank Information:  Bank of America, 89 Broadway Blvd., Fairfax, CA 94930 USA
+1 (415) 453-5830

Client's Name: **Darlene Daggett**                    Client's initials: DHD



*making love happen... since 1986*

268 Bush Street Suite 2930   San Francisco, CA   94104-3503   USA   (+1) 415 332 4111

**Congratulations!!**

For 25 years, Kelleher International has enjoyed matching passionate people with one another, and now you are officially part of the Kelleher International family!! Your Invitation was based on your telephone consultation, your personal interview, as well as the criteria set forth in your profile. The specific membership type that you have selected reflects who you are and who you are searching for.

In an effort to have the best possible outcome, we have also sent you "The Kelleher Way" document so that you can fully embrace and understand how our company works and achieves successful matches year after year.

"The Kelleher Way", begins with setting the appropriate expectations in the beginning with you and your matchmaking team. We ask that you provide your matchmaker(s) with a full detailed profile as soon as possible, including two or three recent photos that positively represent you. We introduce your profile to the entire team that will be involved in your membership within 2 weeks of joining.

The next step is to have a consultation with your personal matchmaker where together you can review your profile in full and add any details that you feel are important. Once the matchmaking process begins, typically we provide one introduction at a time.

As soon as you have accepted your introduction, if you are the man, the expectation is that you will reach out to your match within 24 hours of receiving their

contact information. Our female clients are expected to return phone calls within 24 hours of receiving them. Your matchmaker will assume the match is in the works, unless you inform us otherwise.

Whether you meet your match in person or postpone your date due to circumstances, we ask that you always inform us of the status of your pending meeting. A mandatory feedback form follows each introduction, even if you have already spoken with your matchmaker on the phone.

Please review the following key points with a Kelleher representative during your phone consultation to insure that we are in line with your expectations.

*DHD*
DMD
_____ 1) I understand that the frequency of matches will fluctuate over the course of my membership. Therefore, the amount of people that I will meet, as well as the time in-between introductions, is not something that can accurately be predicted by the representative prior to joining.

*DHD*
DMD
_____ 2) I understand that some months I may receive more than one introduction, and other months I may not receive any introductions.

*DHD*
DMD
_____ 3) If I relocate, I understand that my head matchmaker may change, there is no pro-ration, and my new location may result in more or fewer matches depending on the city.

*DHD*
DMD
_____ 4) My age range is 55 to 65       a. I am flexible Y/N

*DHD*
DMD
_____ 5) I am open to other religions Y  Y/N

*DHD*
DMD
_____ 6) I am open to having children N  Y/N   a. I am flexible Y/N

*DHD*
DMD
_____ 7) I am open to meeting Kelleher clients Y  Y/N

*DHD*
DMD
_____ 8) I am aware of the search aspects of Kelleher International and who Participating Members are.

*DHD*
DMD
_____ 9) I am open to meeting Participating Members (PM's) Y  Y/N

*DHD*
DMD _____ 10) I agree to send in my written feedback form within a 3 day period of my date.

*DHD*
DMD _____ 11) I understand that I will not be re-matched until my written feedback is submitted.

*DHD*
DMD _____ 12) I agree to submit in writing (via e-mail) my requests to come on and off of hold status.

*DHD*
DMD _____ 13) I understand that my matchmakers do not conduct a search for me while I am on hold status.

*DHD*
DMD _____ 14) I agree to re-submit photos if I change anything significant in my personal appearance. i.e., hair color, hair length, facial hair, body weight (gain or loss of 10 lbs or more) or anything else that may alter how my matchmaking team describes me.

*DHD*
DMD _____ 15) I agree to allow my photos to be shown to my potential introductions, at my matchmakers discretion.

*DHD*
DMD _____ 16) I understand that matchmaking is a process and I will allow my matchmaking team the full duration of my membership to conduct my search.

*DHD*
DMD _____ 17) I understand that both "Clients" and "Participating Members" are responsible for the accuracies of their self-submitted profiles and that Kelleher International is not responsible for any inaccuracies on those profiles.

*DHD*
DMD _____ 18) Due to the complexities of relationships, I understand there are no guarantees that Kelleher will find me a long term relationship or marriage.

*DHD*
DMD _____ 19) I understand that there are no refunds of services.

*DHD*
DMD _____ 20) I have read the Term Sheet and Agreement (Contract).

The following area is for any additional information or agreements that have been discussed that are not covered above:

_____

_____

_____

_____

_____

I have had the opportunity to review this with a representative of Kelleher International.

Signature _Darlene Daggett_   Date _May 1, 2014_
Darlene Daggett (May 01 2014)